UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

LAVITA MCCLAIN, as Administratrix )
and Personal Representative of )
the Estate of Ta'Neasha Chappell )
                                   )
        PLAINTIFF                  ) CASE NO. 4:21-cv-00165-SEB-DML
                                   )
v.                                 )
                                   )    *ELECTRONICALLY FILED*
SCOTT FERGUSON                     )
in his individual capacity         )
                                   )
and                                )
                                   )
CLAYTON BANISTER,                  )
in his individual capacity         )
                                   )
and                                )
                                   )
MARK REYNOLDS,                     )
in his individual capacity         )
                                   )
and                                )
                                   )
TAMI BAXTER,                       )
in her individual capacity         )
                                   )
and                                )
                                   )
MILTON EDWARD RUTAN,               )
in his individual capacity         )
                                   )
and                                )
                                   )
JOSH CLARK,                        )
in his individual capacity         )
                                   )
and                                )

WENDY BOSHEARS,                                    )
in her individual capacity                         )
                                                   )
and                                                )
                                                   )
COMMANDER CHRIS EVERHART                            )
in his official capacity as Commander of the       )
Jackson County Jail                                )
                                                   )
and                                                )
                                                   )
SHERIFF RICK MEYER                                 )
in his official capacity as Jackson County Sheriff )
                                                   )
          DEFENDANTS                               )

## FIRST AMENDED COMPLAINT

Comes now the Plaintiff, LaVita McClain ("Plaintiff") as Administratrix of the Estate of Ta'Neasha Chappell (the "estate"), by counsel, and hereby moves this honorable Court for judgment against the above-named Defendants. In support of her First Amended Complaint, Plaintiff states as follows:

## BACKGROUND

1.      This action seeks redress for the objectively unreasonable neglect of Ta'Neasha Chappell, the deliberate indifference to the medical needs of Ta'Neasha Chappell and the cruel and unusual punishment of Ta'Neasha Chappell, all of which caused her to suffer and die while within the custody of the Jackson County Jail/Jackson County Sheriff's office. Ta'Neasha's death and the associated damages claimed herein were the result of the Defendants' actions of causing Ta'Neasha to be deprived of the rights, privileges and immunities secured by the Eighth and Fourteenth Amendments to the United States Constitution, thereby violating 42 U.S.C. § 1983.

2.      The Defendants Rutan, Everhart, Ferguson, Reynolds, Baxter and Banister (Jail Workers) were objectively unreasonable in their failures to provide adequate medical assistance

to Ta'Neasha, were deliberately indifferent to Ta'Neasha's medical needs and took grossly negligent actions that effectively negated her chances of survival, which caused her worsening injuries, suffering and death and which deprived her of protected and guaranteed rights under the Eighth and Fourteenth Amendments of the United States Constitution.

3.      Defendants Meyer and Everhart were responsible for operating the Jackson County Jail so as to not endanger the health and safety of those incarcerated or detained there. As Jackson County Sheriff and Jackson County Jail Commander, these Defendants instituted the policies and otherwise authorized, ratified, approved, or otherwise knowingly acquiesced in the unconstitutional customs and practices which led to an inhumane and unlivable environment at the Jackson County Jail, failed to effectively operate the jail, failed to perform duties to ensure constitutional health care for inmates/detainees, including Ta'Neasha, failed to prevent other unconstitutional conditions of confinement, and failed to provide adequate training to officers regarding medical assistance despite the obvious need for the same. These failures deprived Ta'Neasha Chappell of a federally protected right to adequate medical assistance and caused her to suffer worsening conditions, suffering and death.

## PARTIES, JURISDICTION & VENUE

4.      The Plaintiff, Lavita McClain, is the appointed Administratrix of the Estate of Ta'Neasha Chappell.

5.      Defendant Meyer, as Jackson County Sheriff, is a constitutional officer. At all times relevant herein, he was responsible for the supervision of the Jackson County Jail, the inmates/detainees, and those working within the jail. Meyer had a duty to maintain the custody and to ensure the care of Ta'Neasha or to otherwise delegate that duty to jail deputies, agents, and employees. This Defendant is sued in his official capacity.

3

6.      Defendant Everhart, as commander of the Jackson County Jail, is a constitutional officer. At all times relevant herein, he was responsible for the supervision of the Jackson County Jail, the people incarcerated in the jail, and those working within the jail. Everhart had a duty to maintain the custody and to ensure the care of Ta'Neasha or to otherwise delegate that duty to jail deputies, agents, and employees. This Defendant is sued in his individual and official capacity.

7.      The remaining Defendants were agents and/or employees of the Jackson County Sheriff. These Defendants, upon information and belief, were on duty during periods on July 15, 2021 and/or July 16, 2021 during the time of Ta'Neasha's requests for medical attention, during her serious needs for medical attention, and/or during her state of deteriorating medical condition. These Defendants are sued in their individual capacities.

8.      This Court has both diversity jurisdiction and federal question jurisdiction.

9.      This Court has jurisdiction over these claims as they arise under the Constitution of the United States of America and have been brought before this Court pursuant to 42 U.S.C. § 1983.

10.      This Court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. §1367(a), because the alleged claims arising under Indiana law are so related as to form part of the same case or controversy arising under Ta'Neasha's 42 U.S.C. § 1983 claims.

11.      Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL BACKGROUND

12.      The Jackson County Sheriff and Jail Commander are responsible for the custody, care, and control of both detained and sentenced inmates confined at the Jackson County Jail.

13.     A stated mission of the Sheriff's office is "to ensure the safety and security of the jail for the public as well as the inmates."

14.     The Jackson County Sheriff's office publicly states, in relation to the jail, that it "is our duty to serve all citizens of Jackson County by providing a safe, secure facility where people are treated with dignity and respect…."

15.     The Jackson County Sheriff's office emphasizes that "(p)retrial confinement is not for punishment purposes. It is merely to assure that the arrestee appears in court."

16.     The Jackson County Sheriff's office states, in relation to sentenced inmates, that "it is the responsibility of the Jail Commander and staff to make productive use of the inmates' time, but not to inflict further punishment upon them."

17.     Individuals confined within the county jail system in Indiana are afforded rights and guarantees set forth within applicable provisions under Indiana Code 11 – Corrections.

18.     Individuals confined within the county jail system in Indiana are afforded rights and guarantees set forth within applicable provisions of the United States Constitution, including but not limited to Eighth Amendment prohibitions against cruel and unusual punishment.

19.     Indiana county jails are required to comply with applicable Indiana Jail Standards (210 IAC 3-1), Indiana County Jail Regulations, American Correctional Association (ACA) standards, National Institute of Corrections (NIC) standards, and standards set forth within the Jackson County Jail Standard Operating Procedures.

20.     Within these requirements are those designed to assure that detainees/inmates have constant, unfettered access to emergency medical treatment.

21.     The Jackson County Jail, Defendant Meyer, and/or Defendant Everhart, at all times relevant herein, were obligated to comply within Indiana Code requirements that detainees/inmates

are entitled to medical care, medical personnel, and medical facilities of a quality complying with applicable state licensing requirements; first aid or emergency medical treatment on a twenty-four (24) hour basis.

22.     At all times relevant herein, the Jackson County Jail, Defendant Meyer, and/or Defendant Everhart were responsible for assuring that Jackson County Jail detainees/inmates had access to and received emergency medical treatment.

23.     The Jackson County Jail, Meyer and/or Everhart were required, at all times relevant herein, to adopt, oversee and enforce an Emergency Medical Plan in accordance with ACA standard 5-ACI-6A-08.

24.     This required the jail to have a written plan for access to 24-hour emergency medical care, including on-site emergency crisis intervention; access to an emergency medical vehicle; access to an emergency 24-hour on call physician; and emergency medications, supplies, and medical equipment.

25.     The Jackson County Jail, Meyer, and/or Everhart were required, at all times relevant herein, to adopt, oversee and enforce an Emergency Response plan in accordance with ACA standard 5-ACI-6B-08.

26.     This standard required the jail to have designated correctional staff trained to respond to health-related situations within a four-minute time frame.

27.     This standard required that these designated individuals be trained annually with instruction on recognition of signs and symptoms; knowledge of action in emergency situations; administration of basic first aid; CPR certification; methods of obtaining assistance and procedures for patient transfers to medical facilities.

28.     Indiana County Jail Regulations require the following of Jackson County Jail:

a. Whenever medical services are to be delivered routinely in any jail, adequate space, equipment, supplies, and materials as determined by the responsible physician shall be provided.

b. Notations of jaundice, trauma, bruising, body deformities, and restriction of movement be documented in records.

c. That incarcerated individuals are referred to qualified medical personnel on an emergency basis.

d. That medical complaints are responded to by qualified medical personnel.

e. That 24-hour emergency medical care is available and provided.

f. That measures are in place to afford emergency medical transport.

g. That at least one person per shift be trained in recognition of symptoms of medical illness.

h. That written reports of use of force be promptly created and submitted to the sheriff or his designee.

i. That grievances by incarcerated individuals receive a prompt investigation and response.

29. Standards governing the Jackson County jail require that:

a. Incarcerated individuals who are injured are immediately examined by competent medical personnel.

b. That medical personnel use a doctor approved medical screening form.

c. That the sheriff or his designee visit each area of the jail at least weekly.

d. That a supervisor visits each area of the jail daily and document the same.

30.     At all times relevant herein, the Jackson County Jail/Jackson County Sheriff's office maintained an "Agreement for the Provision of Inmate Health Services" with Advanced Correctional Healthcare (ACH).

31.     The ACH contract with Jackson County requires that:

a.  The jail adopts a Comprehensive Strategic Plan, a Continuous Quality Improvement (CQI) process and a Risk Management program specific to the jail's medical operations

b.  That the jail provides competent nursing services to collaborate with ACH in carrying out the plans put into place by ACH and the jail for medical care of incarcerated individuals.

32.     The Jackson County Jail is required to implement an annual Medical Policy and Procedures that is reviewed and updated/revised as needed.

33.     As of July 16, 2021, a Medical Policy and Procedures for 2021 had not been created and/or distributed to personnel.

34.     As of July 16, 2021, Jackson County jail employees had not documented a review of the 2020 Jail Policy and Procedure Manual.

35.     According to Jackson County Jail policies and procedures and/or agreements with ACH, the following was required as of July 16, 2021:

a.  Emergency medical services are tended to as soon as the need is identified.

b.  Health care staff meetings occur at least monthly and are documented, with minutes created and distributed to the health care staff.

c.  Health care services statistical reports are created monthly.

d.  Emergency services, inmate grievances, and environmental concerns are incorporated into administrative meetings.

e.  That a CQI program (Continuous Quality Improvement) is developed to promote and improve the quality of health care in the jail.

f.  That a CQI committee be formed and assume responsibility for designing action plans to eliminate, correct, or reduce factors that might contribute to less than desired performance in the health care area.

g.  That formal CQI meetings be held and documented at least every four months or three times annually.

h.  That peer reviews are conducted at least twice a year for nurses.

i.  That the CQI committee was required to analyze data to assess performance indicators such as accessibility of health care, appropriateness of decision making, continuity, timeliness, effectiveness, efficiency, and quality.

j.  That the committee initiates and documents a process quality improvement study or outcome study when health care issues are identified, with action plans to follow.

k.  That CQI meeting minutes be created and include reports of progress, comments regarding factors that are beneficial or adversely affecting action plans, statistical data with relative comments, issues or problems identified, new or revised action items, and persons responsible for carrying out the action plans.

l.  That in-custody deaths be reviewed in accordance with the delineated policies, which include but are not limited to a death review within 30 days of the death.

m.  That a standardized review form be used for the peer review and evaluation process.

n.  That correctional officers receive training at least once every two years in administering first aid, recognizing the need for emergency care, and recognizing acute manifestations of certain illnesses.

o.  That sick call data be recorded, usually on a Medical Progress Note.

p.  That the nurse creates practitioner assessment notes.

q.  That emergency transport of an incarcerated individual takes place when an obvious medical emergency exists.

r.  That nursing assessment protocols be implemented and followed.

s.  That a Health Record be created and maintained in accordance with policy.

t.  That an emergency, which is defined as a sudden and immediate need for medical health treatment of an acute illness or an unexpected health need, be promptly addressed and documented.

u.  That the safety of the incarcerated individuals be fully protected.

v.  That the sheriff implement annual goals and develop written programs and procedures designed to achieve the goals.

w.  That there shall be an annual review of the Policy and Procedures Manual scheduled by the Procedures Committee, along with a report of the review.

x.  That storeroom stock and cleaning supplies shall be inventoried on the last day of each month by the day shift, with a log containing a chronological record of each item on hand maintained showing quantities received, issued, and balance on-hand.

y.  That an inventory report be completed and forwarded to the sheriff for review which includes, but is not limited to, items not located, items not properly recorded,

deviation from policy on inventory control, and recommendations for dispositions of discrepancies noted.

z.  That accidents and incidents be reported within 24 hours and documented.

aa. That any use of force incident with injuries results in immediate medical attention.

bb. That data be collected at least monthly and be analyzed by the CQI committee. Amongst the data required to be collected was hospital admissions, outcome study data, unusual cases, and grievance information.

cc. That officers will not lay hands on an incarcerated individual except in self-defense, to prevent escape, to prevent injury to persons or property, or to quell a disturbance.

dd. That a uniform system of reporting all unusual incidents, events and occurrences is used.

ee. That emergency medical needs are tended to as soon as the need is identified.

ff.  That when a concern or complaint about health care is made by a detainee, the facility administration consults with the health care staff.

gg. That treatment errors are documented on a standard form and are reviewed by health care staff within 90 days.

hh. That all correctional officers are to be trained at least every two years to recognize the need for emergency care and intervention in life-threatening situations.

ii.  That emergency transport of the incarcerated individual from the jail shall be conducted when an obvious medical emergency.

jj.  That nursing assessment protocols be followed when a nurse is caring for incarcerated individuals.

kk. That a Shift Activity Log Book be maintained.

ll. That regular, documented inspections of the jail are performed and permanently logged.

mm. That the Jail Commander or representative make a weekly, documented inspection of the jail.

nn. That a Shift Activity/Post Log be maintained.

oo. That the officer assigned to each post shall make a visual inspection at the beginning and at the end of the shift and so note this in the post log.

pp. That post orders are created by the jail and followed by those assigned to the post.

qq. That all staff be trained on written emergency plans and participate in exercise simulating emergency situations at least quarterly.

rr. That the Jackson County Jail maintain a detailed, comprehensive, and accurate method of recording daily shift activity, including personnel assignments, personnel actions, equipment inventory, statistical information, inmate counts, and a brief narrative summary of daily shift activity for each shift.

ss. That the Shift Officer inspect cells and living areas daily.

tt. That quarterly and annual Medical Administrative Reports be prepared which document, amongst other things, Problem Areas, Future Goals, number of inmate referrals to other health facilities, number of ambulance services needed, and number of inmates seen for sick call.

uu. That a Sick Call Log be maintained.

vv. That a Mortality Review Committee be assembled to examine and report upon an inmate death.

ww. That notification to next of kin be accomplished as soon as possible following determination by a physician that the patient is either deceased or is in imminent danger of death due to serious illness or injury.

36. Upon information and belief, at least three chemical solutions used within the Jackson County Jail as of July 15, 2021 were of the type that required the jail, pursuant to county jail regulations, to maintain a Safety Data Sheet.

37. These chemical solutions included, but were not limited to, those used for degreaser, toilet cleaning, and general cleaning within the general population area of the jail.

38. Upon information and belief, the Jackson County Jail had no Safety Data Sheets for any of the chemical solutions used within its facility as of July 15, 2021.

39. That adherence to the foregoing rules, policies, standards, and regulations was ministerial function by virtue of the non-discretionary nature of the obligations imposed by each.

40. Upon information and belief, one or more Defendants either personally failed to adhere to the aforementioned duties created by rules, policies, standards, and regulations or otherwise failed to assure, despite having an obligation to do the same, that those within the Jackson County Jail adhered to the aforementioned rules, policies, standards and regulations.

41. These failures to adhere to the foregoing rules, policies, standards, and regulations demonstrated a deliberate indifference to the constitutional rights of incarcerated people, including the Plaintiff, such that it was plainly obvious that a constitutional violation was likely to occur.

*Widespread practices, policies, customs and decisions of the Jackson County Jail officials deprive detainees and inmates of rights guaranteed under the Eighth and Fourteenth Amendments*

42.     The Jackson County Jail, through express policies and widespread customs, practices, and/or decisions by agents with final policymaking authority, routinely violate constitutionally guaranteed protections to detainees/inmates.

43.     The Jackson County Jail has a lengthy history of deliberate indifference to the needs of people incarcerated there, and of maintaining unconstitutional, intolerant, and otherwise inhumane conditions of confinement for incarcerated people.

44.     Upon information and belief, throughout the years leading up to the incident giving rise to this action, the following conditions have existed within the jail:

   a.   Accumulation of sewage within jail cells, causing detainees/inmates to live in an environment where feces and urine are on the floors of their cells.

   b.   Widespread black mold throughout the jail.

   c.   Exposed openings within the building, resulting in detainees/inmates suffering from spider and other insect bites that have caused permanent scarring and infection.

   d.   Deprivation of showers, outside recreation, classes, meals, commissary, bedding, clothing, proper food portions and nutrition, toilet paper, sanitary pads, and medications to detainees/inmates.

   e.   Overcrowding to the point where five or more detainees/inmates were assigned to a single cell.

   f.   Overt racism within and throughout the jail.

g.  Consistent understaffing to the point where detainees/inmates are deprived of fundamental rights.

h.  Lack of any qualified medical personnel on duty.

i.  Use of excessive force by jail employees against detainees/inmates.

j.  Complete disregard for obvious inmate medical needs.

k.  Forcing inmates placed in isolated holding cells to live naked for days without access to blankets, bedding and/or sufficient nutrition.

l.  Preventable deaths and injuries to inmates who were deprived of medical care and/or medical transport to hospitals despite clear, objective signs of emergency medical needs.

m.  A pattern and practice of depriving inmates of testing, assessment, and treatment for COVID-19.

n.  Subjecting incarcerated individuals to criticism, ridicule, and verbal attacks when incarcerated individuals complain of injuries, illness, and severe medical conditions.

o.  Exposing incarcerated individuals to an unreasonable risk of exposure to harmful, toxic substances which are capable of causing severe injury or death.

p.  A pattern and practice of failing to maintain required paperwork and  safety data sheets associated with harmful, toxic substances maintained within the jail.

45.     Upon information and belief, those employed within the Jackson County Jail routinely ignore legitimate and valid inmate grievances and other expressed complaints raised by incarcerated individuals and outside members of the community.

46.     Jackson County Jail, Meyer, and Everhart, at all times relevant herein, employed a

widespread custom or practice of ignoring detainees/inmates' serious medical needs, depriving incarcerated individuals of timely and reasonable access to medical care, and failing to provide a sufficient number of qualified, on-site medically trained personnel to assure that emergency medical care was available when medical emergencies arise.

47.     These Defendants consciously ignored a need for action, with the Sheriff and Commander adopting a *de facto* policy of violating detainees/inmates' constitutional rights to medical care in a manner that constitutes a deliberate indifference to detainees/inmates' constitutional rights.

48.     Jackson County, Meyer, and/or Everhart, at all times relevant herein, through policies, customs, practices, directives, ratification, or otherwise, failed to comply with regulations and standards promulgated to assure that detainees/inmates received timely emergency medical attention and/or timely transports to the hospital for emergency medical conditions.

49.     Upon information and belief, at all times relevant herein, many directives, policies, procedures, customs, practices, actions, and inactions within the Jackson County Jail prioritized expense reduction over the health, safety, and basic needs of detainees/inmates.

50.     Upon information and belief, Jackson County is responsible, in most situations, for the initial payment of medical transports and hospital treatment for detainees/inmates.

51.     At all times relevant herein, the costs of hospital admissions and emergency medical care for detainees/inmates, while potentially prohibitive at times, are part of doing business as a county jail in Indiana.

52.     Upon information and belief, Jackson County, Meyer, and Everhart, through policies, procedures, customs, practices, directives, ratification or otherwise, prioritized cost-saving and the mitigation of exposure for medical bills over the health and lives of

detainees/inmates.

53.     Several examples of this exist.

54.     For instance, upon information and belief, several inmates at the Jackson County Jail were diagnosed with COVID-19 by a former member of the jail staff. Despite this, Jackson County, Meyer, and/or Everhart have reported that none of the detainees/inmates have had COVID-19 at any time while incarcerated at the Jackson County Jail.

55.     A report of COVID-19 within the Jackson County Jail would undoubtedly result in the accrual of prohibitive expenses due to the need for medical services, transports, hospital treatment, quarantining, added medical personnel, supplies, sanitization, and otherwise.

56.     Upon information and belief, the decision was made not to disclose the positive diagnoses in order to avoid these costs.

57.     Upon information and belief, an incarcerated female detained within Jackson County Jail made complaints of pains in or around her midsection for multiple days consecutively in 2021.

58.     Upon information and belief, the complaints were repeatedly ignored or otherwise not reasonably addressed by Rutan on assessment.

59.     Upon information and belief, Rutan made fun of the woman and disregarded the seriousness or legitimacy of her complaints.

60.     Upon information and belief, this woman was ultimately taken to the emergency room, where she had to have emergency surgery to remove her gall bladder.

61.     Upon information and belief, an incarcerated male was confined to an isolated cell while naked.

62.     Upon information and belief, Defendant Everhart used force upon this incarcerated man, causing him to suffer severe pain.

63.     Upon information and belief, Everhart and others ignored the serious medical needs of this incarcerated man in a manner that demonstrated a deliberate indifference to the rights of incarcerated persons.

64.     Upon information and belief, following his release from the jail days after the incident, the man was promptly taken to the emergency room and diagnosed with broken ribs.

65.     Upon information and belief, despite Jackson County, Meyer, and/or Everhart being responsible at all times relevant herein for assuring that Jackson County Jail detainees/inmates had access to emergency medical treatment, only one jail nurse was employed with the Jackson County Jail throughout all or most of the duration of Ta'Neasha Chappell's incarceration within the jail.

66.     Upon information and belief, the Jackson County Jail had an unfilled vacancy for a second jail nurse throughout the majority of 2021.

67.     Upon information and belief, multiple manners existed for Jackson County, Meyer, and/or Everhart, via a contract service, temporary service or otherwise, to fill the nurse vacancy on a temporary basis until a full-time hire was made.

68.     Upon information and belief, Jackson County, Meyer, and/or Everhart, despite being short a full-time jail nurse for several months in 2021, did not fill the position on a contract basis or otherwise.

69.     Upon information and belief, several paramedics were employed with the Jackson County EMS at all times relevant herein.

70.     Upon information and belief, Jackson County, Meyer, and/or Everhart did not, at any time relevant herein, request for a paramedic to be dedicated to the jail at times when no medical/nurse personnel were on duty.

71.     Upon information and belief, Jackson County, Meyer and/or Everhart maintained a policy or custom, in situations where a hospital transport was eventually authorized, for jail workers to take the detainees/inmates to the hospital themselves rather than calling for an EMS response, assessment, and transport.

72.     Upon information and belief, a known custom within the Jackson County Jail was for jail workers to initially accuse various detainees/inmates of faking medical complaints, rather than following protocols required to assure that medical needs of incarcerated individuals are promptly assessed and treated.

73.     Upon information and belief, the Jackson County Jail has a longstanding practice of failing to timely review and properly respond to requests of detainees/inmates for medical treatment.

74.     Upon information and belief, the Jackson County Jail has systemic problems in timely scheduling detainees/inmates' medical appointments.

75.     Upon information and belief, the Jackson County Jail has systemic problems in ignoring or otherwise not properly addressing detainees/inmates' grievances regarding failures to provide proper and timely medical attention.

76.     Upon information and belief, the Jackson County Jail has systemic problems in ignoring or otherwise not properly addressing detainees/inmates' grievances regarding failures to provide proper and timely medical attention.

*The neglect and death of Ta'Neasha Chappell*

77.     On July 15, 2021, Ta'Neasha Chappell was a pretrial detainee confined to the Jackson County Jail.

78.     She had been detained at the jail since May 26, 2021.

79.     Incarcerated females within the Jackson County Jail are assigned to a pod and are housed within a cell located in the assigned pod.

80.     Upon information and belief, there are three separate pods for incarcerated females: H-Pod, I-Pod and J-Pod.

81.     Ta'Neasha, as of July 15, 2021, was assigned to J-pod.

82.     In the afternoon of July 15, 2021, Ta'Neasha fell ill, vomiting repeatedly.

83.     Ta'Neasha's vomit contained blood.

84.     Ta'Neasha was not given adequate assessment by any jail workers for this condition.

85.     On the night of July 15, 2021, Ta'Neasha repeatedly expressed to jail workers that she was extremely ill, needed medical attention, and needed transport to a hospital.

86.     Ta'Neasha was vomiting.

87.     Ta'Neasha had a fever.

88.     Around 11:30 p.m. on July 15, 2021, Ta'Neasha's cellmate requested to be moved due to the nature of Ta'Neasha's illness.

89.     Jail workers promptly granted this request, moving the woman to another cell within minutes.

90.      Following this cellmate transfer, Ta'Neasha was alone in her cell for the remainder of the night.

91.     Shortly after midnight on July 16, 2021, Ta'Neasha was on the intercom requesting help from jail workers.

92.     While requesting help from jail workers shortly after midnight on July 16, 2021, Ta'Neasha was moaning and throwing up.

93.     A jail worker responded to Ta'Neasha's cell after this call, but failed to transport her to a hospital, place her in a medical holding cell, or obtain the services of a qualified medical professional to come and assess Ta'Neasha.

94.     Instead, the jail worker left Ta'Neasha in her cell, returning later to provide a bucket for Ta'Neasha to use for vomiting.

95.     Ta'Neasha made multiple additional intercom requests for medical assistance, including but not limited to one shortly before 1 a.m. and one shortly after 3 a.m.

96.     In each occasion, jail workers did not place Ta'Neasha in a medical holding cell, did not have her transported to the hospital, and did not obtain the services of a qualified medical professional to come and assess Ta'Neasha.

97.     At 5 a.m., more than 12 hours after Ta'Neasha began vomiting blood, she continued to vomit in her cell.

98.     Throughout the night and into the morning of July 16, 2021, Ta'Neasha continued to vomit and have diarrhea.

99.     Throughout the night and into the morning of July 16, 2021, Ta'Neasha made repeated calls on the intercom in which she indicated the severe nature of her illness and her need for medical attention.

100.    Ta'Neasha's requests for help were loud enough to where they could be heard by incarcerated individuals throughout her assigned pod.

101.    Ta'Neasha had a bucket by her side into which she repeatedly dry heaved and vomited.

102.    Ta'Neasha had uncontrollable bowel movements which caused her to defecate herself.

103.    Ta'Neasha repeatedly expressed to jail workers that she was vomiting blood.

104.    Those concerns were repeatedly ignored.

105.    Throughout the night and into the morning of July 16, 2021, one or more jail workers repeatedly denied Ta'Neasha's requests to be seen by a medical worker.

106.    Throughout the night and into the morning of July 16, 2021, one or more jail workers repeatedly denied Ta'Neasha's requests to be transported to a hospital.

107.    Throughout the night and into the morning of July 16, 2021, there were no qualified medical personnel working within the jail.

108.    Upon information and belief, a medical doctor was not consulted to personally evaluate Ta'Neasha's behalf throughout the night.

109.    Upon information and belief, a nurse was not consulted to personally evaluate Ta'Neasha throughout the night.

110.    Ta'Neasha was not given a proper medical assessment by a nurse or any other medical worker throughout the night.

111.    Ta'Neasha was not transported to the hospital or offered to be taken to the hospital throughout the night.

112.    The shift supervisor on duty did not personally come to speak with Ta'Neasha throughout the night.

113. Upon information and belief, one or more jail workers accused Ta'Neasha of faking her illness while she was expressing her serious medical condition throughout the late night/early morning of July 15-16, 2021.

114. In the morning of July 16, 2021, Ta'Neasha failed to report to breakfast.

115. Shortly before 9 am on July 16, 2021, a jail nurse went to Ta'Neasha's cell.

116. The jail nurse, on the morning of July 16, 2021, did not request for Ta'Neasha to be transported to a hospital, did not do any lab testing, and did not have her taken to a medical holding cell.

117. The jail nurse, on multiple occasions on July 16, 2021, accused Ta'Neasha of faking her illness.

118. The only thing provided to Ta'Neasha on the morning of July 16, 2021 for her severe, life threatening emergency medical condition was a Tylenol.

119. Upon information and belief, Ta'Neasha had a history of taking Ondansetron as an anti-nausea medication and that this was made known or otherwise available to one or more of the jail workers prior to and on July 15, 2021.

120. Upon information and belief, Ta'Neasha was not offered or administered this medication at the jail on July 15-16, 2021.

121. Shortly after 9 a.m. on July 16, 2021, at a time after Ta'Neasha was given a Tylenol, Ta'Neasha was on the intercom pleading for help.

122. Shortly before 10 a.m. on July 16, 2021, Ta'Neasha was again on the intercom pleading for help.

123. Shortly after 10 a.m. on July 16, 2021, a jail nurse went to Ta'Neasha's cell.

124.     The jail nurse, following this visit, did not request for Ta'Neasha to be transported to a hospital, did not do any lab testing, and did not have her taken to a medical holding cell.

125.     Shortly before 11 a.m. on July 16, 2021, Ta'Neasha fell onto the floor in a manner that was concerning to several incarcerated individuals within J-Pod.

126.     Ta'Neasha went to the common area of J-Pod, wearing nothing but her underwear.

127.     Ta'Neasha hit the call box for help and lied on the floor.

128.     While in the common area of J-Pod in the morning of July 16, 2021, Ta'Neasha was lying on the floor, unclothed, and covered in her own vomit and feces.

129.     Ta'Neasha's feces was also adjacent to her while she was on the ground in the J-pod common area.

130.     Upon information and belief, one or more security cameras recorded footage of Ta'Neasha while she was on the ground.

131.     Upon information and belief, multiple jail workers were able to monitor Ta'Neasha, via security footage, while she was on the ground.

132.     While Ta'Neasha was lying on the floor in the common area on the morning of July 16, 2021, unclothed and covered in her own vomit and feces, Ta'Neasha was deprived of transport to the hospital by jail workers.

133.     While Ta'Neasha was lying on the floor in the common area on the morning of July 16, 2021, unclothed and covered in her own vomit and feces, Ta'Neasha was not taken to a medical holding cell.

134.     Those workers within the jail who were responsible for monitoring the common area in J-Pod, including the area of Ta'Neasha while she was on the ground in J-pod, repeatedly failed to address Ta'Neasha's serious medical needs.

135.    Eventually, a jail worker simply assisted Ta'Neasha with returning to her cell.

136.    Following the return to her cell on the morning of July 16, 2021, Ta'Neasha was again on the intercom repeatedly seeking help.

137.    Ta'Neasha repeatedly advised jail workers on July 15, 2021 and July 16, 2021, via the intercom in her cell and while cell rounds were made, that she needed emergency medical attention and hospital transport.

138.    Ta'Neasha's requests for help were repeatedly ignored and/or denied throughout the night by jail workers and shift supervisors.

139.    In the early afternoon of July 16, 2021, Ta'Neasha was seen by a jail worker.

140.    The jail worker, rather than transport Ta'Neasha to a hospital or assure that she was assessed by a medical doctor, escorted her to a group holding cell while Ta'Neasha's jumpsuit was unbuttoned and her naked chest was exposed

141.    While being taken to the group holding cell, a jail worker was at times holding the back of her jumpsuit.

142.    At one point, he let go, causing Ta'Neasha to fall to the ground.

143.    The back of Ta'Neasha's head hit the ground due to the fall.

144.    Ta'Neasha fell because of the failure of the jail worker to make reasonable efforts to assure for Ta'Neasha's safe transfer.

145.    Ta'Neasha's condition by the time of her transfer to a group holding cell was grim: she was weak, her skin tone had changed to the point where she was jaundiced, her ability to communicate verbally had decreased, and she was in obvious pain, fear, and a state of reduced awareness of her surroundings.

146. The initial holding cell to which Ta'Neasha was taken was occupied by several other female detainees/inmates.

147. Ta'Neasha was not offered or provided medical transport or medical doctor assessment while she was on the ground in the group holding cell.

148. While she was within the holding cell, Ta'Neasha was accused by one or more jail workers of faking her illness.

149. Defendant Rutan, the jail nurse responsible at the time for attending to Ta'Neasha's medical needs, was one of those within the jail who accused Ta'Neasha of faking her illness while she was in the holding cell with other female detainees/inmates.

150. Ta'Neasha repeatedly stated to jail workers and detainees/inmates that she was being deprived of medical treatment that she needed due to her condition.

151. Ta'Neasha's needs were clear to multiple detainees/inmates within the group holding cell. She could not stand, was weak, was unstable, and was covered in sweat.

152. One or more female detainees/inmates in the holding cell with Ta'Neasha repeatedly banged on the door and called on the intercom for medical attention to be given to Ta'Neasha.

153. Ta'Neasha was neither offered nor provided medical transport or medical doctor assessment while she was in the holding cell with other female detainees/inmates.

154. Upon information and belief, a little more than an hour passed by before Ta'Neasha was removed from the group holding cell.

155. Rather than transporting Ta'Neasha to the hospital, jail workers moved Ta'Neasha to a single holding cell.

156. Ta'Neasha remained in the single holding cell while her condition further

deteriorated.

157.    Ta'Neasha suffered a head injury in the single holding cell which was either observed or should have been observed by jail workers on security footage, and which never would have happened at all had she been transported to the hospital in a timely manner.

158.    Upon sustaining this injury, Ta'Neasha's head was not properly assessed by jail workers or medical personnel, and she was not transported to the hospital.

159.    Over the next hour and a half, Ta'Neasha remained confined to the holding cell.

160.    Ta'Neasha's condition was dire: she was jaundiced, unable to coherently communicate/uttering things that did not make sense, was unclothed and covered in sweat, had a decent sized hematoma to her forehead, and struggled with trying to stand.

161.    While in the single holding cell, multiple jail workers refused to provide care to Ta'Neasha until she met their demands of dressing. When Ta'Neasha was unable to dress, these jail workers left her cell.

162.    While in the single holding cell, Ta'Neasha was subjected to repeated accusations of faking by jail workers.

163.    Upon information and belief, neither a medical doctor nor an ambulance responded to personally evaluate Ta'Neasha at the jail for more than 23 hours after Ta'Neasha first began throwing up blood and complaining of a serious illness and medical emergency.

164.    EMS workers were finally called to the jail after 3 p.m. on July 16, 2021.

165.    EMS workers noted the severe nature of Ta'Neasha's condition; she was jaundiced, nonverbal, had bile dried to her lips, had yellow eyes and a very large yellowing on her chest, had obvious trauma to her head, and struggled with ambulating.

166.    Despite the severe nature of Ta'Neasha's condition, jail workers advised EMS

personnel that Ta'Neasha's condition was non-emergent.

167.   As such, Ta'Neasha was transported, non-emergent, to the local hospital.

168.   Two jail workers, who upon reasonable belief were Defendants Reynolds and Boshears, remained in Ta'Neasha's hospital room.

169.   At one point, when there were no hospital workers in Ta'Neasha's room, the jail workers with Ta'Neasha placed their hands on her.

170.   Ta'Neasha did not survive her condition, dying in the early evening of July 16, 2021.

171.   Had the Defendants responded and attended to Ta'Neasha in an objectively reasonable manner, Ta'Neasha would not have died.

172.   Had the Defendants not been deliberately indifferent to Ta'Neasha's serious medical needs, she would not have died.

173.   Had the conditions of Ta'Neasha's confinement been objectively reasonable, she would not have died.

174.   Had the individual Defendants been adequately trained to respond to incarcerated individuals with serious medical needs, Ta'Neasha would not have died.

175.   Had Defendant Meyer and/or Defendant Everhart not instilled customs and practices of deliberate indifference to the medical needs of incarcerated individuals, Ta'Neasha would not have died.

176.    Ta'Neasha's family was never advised of her condition prior to her death and was not advised of her death until about 3 hours after she died.

177.   The harm to Ta'Neasha, at all times relevant herein, was objectively serious.

178.    Each of the Defendants herein was deliberately indifferent to the treatment of the Plaintiff's serious health and safety concerns in a manner that directly and proximately caused her to die.

179.    Upon information and belief, neither the Sheriff nor the Jail Commander made any efforts to assess Ta'Neasha on July 15/16, 2021.

180.    Upon information and belief, the Sheriff and the Jail Commander routinely fail to perform their required walk-throughs and assessments of the jail.

181.    Upon information and belief, the Sheriff and/or the Jail Commander routinely reinforce policies or customs within the jail that prioritize the financial condition of the jail over the needs for medical care and medical transport of incarcerated individuals.

182.    Jackson County, pursuant to Indiana regulations, is financially responsible under many circumstances for the medical bills of certain incarcerated individuals who receive treatment for conditions suffered while in custody or otherwise detained.

183.    The patterns and practices of the jail, while under the orders/instructions/oversight of the Sheriff and/or Jail Commander, demonstrate a history of trying, and in many cases succeeding, in unlawfully mitigating the exposure for the medical bills associated with treatment of incarcerated individuals.

184.    Examples of these policies and customs existent within the jail include, but are not limited to:

      a.   Failing to transport inmates/detainees to the hospital, despite severe emergency medical conditions.

      b.   Failing to test inmates/detainees for serious medical conditions, such as COVID-19, despite clear and objective inmate symptoms of the same.

c. Processing paperwork to reflect that an inmate/detainee was released from custody at a time prior to the medical treatment, while failing to advise the providers that the incarcerated individual's condition arose in custody and that the County is thus potentially responsible for the billing.

d. Failing to assure that the jail is adequately staffed with qualified medical personnel.

e. Cancelling the contracted mental health services and failing to procure mental health service providers, despite repeated jail audits citing the jail for this failure.

f. Failing to advise county officials of the actual resources needed for medical treatment and medical bills of incarcerated individuals, while instead identifying resources that are woefully inadequate.

## CLAIMS FOR RELIEF

### COUNT I:

#### DENIAL OF MEDICAL TREATMENT & INADEQUATE MEDICAL CARE IN VIOLATION OF FOURTEENTH AMENDMENT RIGHTS

**(Defendants Ferguson, Boshears, Reynolds, Baxter, Clark, Banister and Rutan)**

185. Plaintiff incorporates all preceding paragraphs of this Complaint as if fully set forth herein.

186. Each of these Defendants are "persons" within the meaning of 42 U.S.C. § 1983.

187. These Defendants, in their individual capacities and while acting under color of law, were through action and inaction deliberately indifferent to the medical needs of Ta'Neasha in violation of the Fourteenth Amendments of the United States Constitution.

188. Ta'Neasha, at all times relevant herein, was a pretrial detainee.

189. Ta'Neasha's repeated requests for medical assistance were repeatedly denied by the Defendants.

190.    Ta'Neasha's repeated requests for medical transport to the hospital were repeatedly denied by the Defendants.

191.    The risks of harm to Ta'Neasha, as described herein, were objectively serious.

192.    These Defendants knew or should have known that a substantial risk of serious harm to Ta'Neasha existed.

193.    These Defendants disregarded substantial risks of serious harm to Ta'Neasha.

194.    Upon information and belief, Defendants Ferguson and Clark were sergeants working within the jail as shift supervisors during several hours where Ta'Neasha was ill, where she was expressing her illness and where she was seeking medical transport.

195.    Upon information and belief, Ferguson and Clark were, during some or all of these periods, responsible for assuring that Ta'Neasha's medical needs were addressed and that she was afforded prompt and adequate medical attention and transport.

196.    Upon information and belief, Ferguson and Clark did not, at any time relevant herein, take reasonable measures to assure that Ta'Neasha's medical needs were addressed or that she was afforded prompt and adequate medical attention and transport.

197.    Upon information and belief, Defendants Banister, Reynolds, Boshears, and Baxter were deputies working within the jail during several hours where Ta'Neasha was expressing her illness and need for medical transport.

198.    Upon information and belief, Defendants Banister, Reynolds, Boshears, and Baxter were, during some or all of these periods, responsible for assuring that Ta'Neasha's medical needs were addressed and that she was afforded prompt and adequate medical attention and transport.

199.    Upon information and belief, Defendants Banister, Reynolds, Boshears, and Baxter did not, at any time relevant herein, take reasonable measures to assure that Ta'Neasha's medical

needs were addressed and that she was afforded prompt and adequate medical attention and transport.

200.    Upon information and belief, Defendant Rutan was a nurse working within the jail during several hours where Ta'Neasha was expressing her illness and need for medical transport.

201.    Upon information and belief, Defendant Rutan was, during some or all of these periods, responsible for assuring that Ta'Neasha's medical needs were addressed and that she was afforded prompt and adequate medical attention.

202.    Upon information and belief, Defendant Rutan did not, at any time relevant herein, take reasonable measures to assure that Ta'Neasha's medical needs were timely addressed and that she was afforded prompt and adequate medical attention and transport.

203.    These Defendants acted purposefully, knowingly, and recklessly when they failed to address Ta'Neasha's serious medical needs.

204.    These Defendants acted purposefully, knowingly, and recklessly when they inadequately addressed Ta'Neasha's serious medical needs.

205.    Through action and inaction, these Defendants demonstrated a deliberate indifference to Ta'Neasha's medical needs, in violation of her constitutional rights.

206.    These Defendants' actions were intentional, willful, and in reckless disregard for Ta'Neasha's clearly established rights guaranteed under the Fourteenth Amendment.

207.    These Defendants' actions were objectively unreasonable in violation of Due Process Guarantees under the Fourteenth Amendment.

208.    These Defendants' actions deprived Ta'Neasha, as a pretrial detainee, of her right to adequate medical care during her detention.

209. These Defendants' failure to transfer Ta'Neasha to a hospital in a reasonable and timely manner allowed her deterioration to reach a dangerous point.

210. These Defendants' actions and inactions diminished Ta'Neasha's chances of survival.

211. The actions and inactions of these Defendants directly caused a deprivation of Ta'Neasha's constitutional rights and proximately caused her worsening injuries, suffering and death.

212. These Defendants' actions and omissions constituted willful, wanton, reckless, conscious, deliberate indifference to and disregard for Ta'Neasha's constitutional rights, such that Ta'Neasha's Estate is entitled to recover punitive damages.

## COUNT II:

### MONELL VIOLATIONS: POLICIES OR CUSTOMS OF INADEQUATE MEDICAL CARE & INADEQUATE CONDITIONS OF CONFINEMENT IN VIOLATION OF THE EIGHTH & FOURTEENTH AMENDMENTS

### (Defendants Meyer and Everhart)

213. Plaintiff incorporates all preceding paragraphs of this Complaint as if fully set forth herein.

214. At all times relevant herein, Defendants Meyer and Everhart were the decision and policy makers for the operations of the jail and the safety and care of the detainees/inmates.

215. These Defendants knowingly and deliberately failed to implement or otherwise enforce policies and procedures to ensure constitutionally adequate access to medical care.

216. These Defendants, acting under color of state law and pursuant to a policy or custom, operated and maintained the Jackson County Jail and trained the jail workers in a manner that posed a risk to the health and safety of the inmates/detainees, including failing to operate the

facility and properly train the staff to care for and protect the inmates/detainees and failing to provide adequate medical care to the inmates/detainees, resulting in the death of Ta'Neasha.

217.    These Defendants were aware, at all times relevant herein, that inmates/detainees were frequently denied access to adequate, timely, and appropriate medical care, resulting in the inmates/detainees' exposure to needless harm and suffering, but failed to take steps to ensure that inmates/detainees at the Jackson County Jail were adequately monitored and afforded access to timely and necessary medical care.

218.    These Defendants failed to take remedial action in the face of objective constitutional shortcomings.

219.    These Defendants knew or should have known that the serious medical needs of inmates/detainees were going unaddressed, and that Ta'Neasha and others would suffer without access to timely, appropriate, and constitutionally required care.

220.    These Defendants failed to take steps to remedy or prevent the danger to Ta'Neasha, although they knew that jail workers engaged in conduct that endangered the health and safety of inmates/detainees, including Ta'Neasha. Among the failures known was the failure by deputies to perform proper security and health checks, the failure to properly monitor inmates/detainees, the failure to execute emergency medical plans, the failure to timely and properly respond to inmate/detainees calls for aid/assistance, and the failure to respond to or provide inmates/detainees with access to appropriate care for serious medical needs.

221.    These unaddressed failures manifested in the deliberate indifference to Ta'Neasha's serious need for medical care and were a direct proximate cause of her suffering and death.

222. These Defendants failed to properly manage and supervise the Jackson County Jail operations and failed to ensure that appropriate procedures, protocols, and disciplinary measures were in place to prevent constitutional deprivations at the Jackson County Jail, including but not limited to the constitutionally required attention to the serious medical needs of inmates/detainees, such as Ta'Neasha.

223. These Defendants had direct, personal, and specific knowledge of the constitutionally inadequate operations, medical care, and training at the Jackson County Jail and engaged in a policy or custom which caused a deliberate indifference towards Ta'Neasha Chappell.

224. The persistent and widespread practice of deliberate indifference to the needs of the inmates/detainees was sufficient to constitute an official custom and practice.

225. Serious, unaddressed injuries and medical conditions occur again and again at the Jackson County Jail as a result of the failures to properly observe detainees/inmates, report their medical issues, and/or properly address the serious medical issues.

226. These Defendants have long been on notice of these failures, have failed to do anything about it, and have deliberately ignored them.

227. These Defendants' policies and customs of failing to train or otherwise assure that subordinates were observing, reporting and caring for issues related to detainees/inmates' medical needs fostered a culture of indifference.

228. These Defendants' policies and customs caused a deliberate indifference to and a deprivation of Ta'Neasha's constitutional rights and were a direct proximate cause of Ta'Neasha's death.

229. As a direct proximate result of these Defendants' conduct in their official capacities, Ta'Neasha suffered physically and emotionally and the surviving beneficiaries of Ta'Neasha have

suffered and will continue to suffer sorrow, mental anguish, loss of companionship, loss of comfort and guidance, funeral bills, loss of income and support, and other related bills and expenses.

## COUNT III:

### MONELL VIOLATIONS: FAILURE TO ADEQUATELY TRAIN OFFICERS IN VIOLATION OF 42 U.S.C. §§ 1983

### (Defendants Meyer and Everhart)

230.    Plaintiff incorporates all preceding paragraphs of this Complaint as if fully set forth herein.

231.    At all times relevant herein, Defendants Meyer and Everhart were the decision and policy makers for the operations of the jail and the safety and care of the detainees/inmates.

232.    At all times relevant herein, those housed within the Jackson County Jail, including Ta'Neasha Chappell, had a constitutionally protected right to receive adequate medical assistance.

233.    At all times relevant herein, the need for further training to officers on providing medical assistance was obvious.

234.    There has been an unreasonable and excessive number instances in which the medical needs of incarcerated individuals within the Jackson County Jail have been ignored, medical requests have been denied, and in which medical care has been inadequate.

235.    The training on medical conditions of detainee/inmates — a requirement under the Eighth Amendment — was so inadequate and so widely ignored that these Defendants were on notice that a constitutional violation was a highly predictable consequence of their failure to act.

236.    The need to train and enforce policies on detainees/inmates' constitutional rights to medical assessment and treatment is so obvious that the failure to properly do so was a deliberate indifference to Ta'Neasha Chappell's constitutional rights.

237.    These Defendants knowingly and deliberately failed to adequately train officers about providing medical assistance to those incarcerated within the Jackson County Jail.

238.    These Defendants acted recklessly, intentionally, or with gross negligence when they failed to train officers in a manner that constituted to deliberate indifference to the constitutional rights of those housed in the Jackson County Jail, including Ta'Neasha Chappell.

239.    The Defendants' failure to properly train officers on providing medical assistance to those housed in the jail was a direct and proximate cause of Ta'Neasha Chappell's worsening conditions, her suffering and her death.

## PRAYER FOR RELIEF

The Plaintiff, for the individual capacity claims, seeks actual and punitive damages and such other and further relief as this honorable court and the jury deems just and proper.

The Plaintiff, for the official capacity claims, seeks actual damages and such other and further relief as this honorable court and the jury deems just and proper.

The Plaintiff demands judgment against all Defendants, jointly and severally, in an amount in excess of Thirty Million Dollars ($30,000,000.00), for compensatory damages, along with costs incurred in the pursuit of just resolution to this matter, prejudgment and post-judgment interest, and attorneys' fees.

The Plaintiff demands judgment against all individual capacity Defendants, whose conduct, having been so willful, wanton, and/or reckless as to evince a conscious disregard for the rights of others, for an award of punitive damages, jointly and severally, in a just amount to be established at trial.

The Plaintiff demands all other damages to which she may be entitled, including but not limited to attorney's fees, prejudgment and post-judgment interest, and allowable costs incurred.

Plaintiff seeks such further and additional relief as this Court deems just and proper, including but not limited to the right to amend this action and add additional parties to the extent that discovery in this case identifies the need for the same.

Respectfully submitted,

*/s/ Craig Sam Aguiar*
Craig Sam Aguiar
1900 Plantside Drive
Louisville, KY 40299
Telephone: (502) 400-6969
Facsimile: (502) 491-3946
sam@kylawoffice.com
*Counsel for Plaintiff*