UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | |
|---|---|
| LAVITA MCCLAIN as Administratrix and Personal Representative of the Estate of Ta'Neasha Chappell,<br><br>    Plaintiff,<br><br>  v.<br><br>SCOTT FERGUSON, et al.,<br><br>    Defendants. | No. 4:21-cv-00165-SEB-KMB |

**Order Granting in Part and Denying in Part Defendants' Motion to Exclude and Limit Testimony of Plaintiff's Experts**

This civil rights lawsuits involves the death of Ms. Ta'Neasha Chappell while she was incarcerated as a pretrial detainee at the Jackson County Jail. Plaintiff Lavita McClain, as the administratrix of Ms. Chappell's Estate ("the Estate" or "Plaintiff"), seeks damages from a variety of correctional and medical defendants under 42 U.S.C. § 1983 and state court theories.

Pending before the Court is Defendants' Motion to Exclude and Limit Testimony of Plaintiff's Expert Witnesses. Dkt. 153. For the following reasons, the motion is **granted in part and denied in part**.

    **I.**  **Relevant Background**

As described in the Court's July 25, 2023, Order on the parties' cross-motions for summary judgment, Ms. Chappell was a pretrial detainee in the Jackson County Jail when she fell ill the evening of July 15, 2021. Dkt. 133 at 10. Licensed nurse practitioner Ed Rutan was contacted after Ms. Chappell vomited. *Id.* Nurse Rutan responded that Ms. Chappell would need to wait until the following morning to be seen. *Id.* Various correctional officers interacted with Ms. Chappell over the course of the evening into the following day as her condition deteriorated. *Id.* at 10-26. An

1

officer called for an ambulance around 3:15 PM on July 16, and Ms. Chappell was transferred to an area hospital around 4:00 PM. *Id.* at 25-26.

Medical staff at the hospital began performing CPR on Ms. Chappell at 4:13 PM and continued their efforts until 5:42 PM, when the attending physician declared Ms. Chappell deceased. *Id.* at 26. Medical experts retained by both parties concluded that Ms. Chappell likely died from sepsis due to an infection. *Id.* at 27.

This matter is set for a jury trial beginning on May 5, 2025. Pending before the Court is Defendants' motion to exclude and limit testimony of Plaintiff's expert witnesses. Dkt. 153. Plaintiff has tendered expert opinions from a correctional nurse, a medical doctor, a jail administrator, and a labor economist. Defendants challenge aspects of each expert's report. Plaintiff has filed a response in opposition,[1] and Defendants have filed a reply.

## II.    Legal Standard

Federal Rule of Evidence 702 requires the Court to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). The Court has broad discretion in determining the admissibility of expert testimony. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142–43 (1997). *See also Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 704 (7th Cir. 2009). The proponent of expert testimony bears the burden of demonstrating its admissibility. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

---

[1] As Defendants point out, Plaintiff's response was filed after the deadline to do so and without the Court's leave to file a belated response. Defendants request that the Court strike the response. Dkt. 155 at 2. The Court expects counsel to be familiar with and adhere to the Court's local rules. However, given the complexity of the issues at hand, the Court benefits from Plaintiff's briefing and therefore will consider the response. Although the Court may strictly enforce its local rules, "[i]t does not follow . . . that district courts cannot exercise their discretion in a more lenient direction: litigants have no right to demand strict enforcement of local rules by district judges." *Modrowski v. Pigatto*, 712 F.3d 1166, 1169 (7th Cir. 2013).

2

Federal Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if: (a) the expert's . . . knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see also Daubert*, 509 U.S. at 593-94.

The Court must engage in a three-step analysis when fulfilling its "gatekeeping obligation" under Rule 702 and determine: "whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Gopalratnam v. Hewlett–Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (quoting *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010)). "'Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony.'" *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) (quoting *Carroll v. Otis Elevator Co.,* 896 F.2d 210, 212 (7th Cir. 1990)). "'Ordinarily, courts impose no requirement that an expert be a specialist in a given field, although there may be a requirement that he or she be of a certain profession, such as a doctor.'" *Id.* at 617 (quoting *Doe v. Cutter Biological, Inc.*, 971 F.2d 375, 385 (9th Cir. 1992)).

The "key to the gate is not the ultimate correctness of the expert's conclusions. Instead, it is the soundness and care with which the expert arrived at her opinion; the inquiry must 'focus ... solely on principles and methodology, not on the conclusions they generate.'" *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013) (citing *Daubert*, 509 U.S. at 595). "So long as the principles and methodology reflect reliable scientific practice, '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are

the traditional and appropriate means of attacking shaky but admissible evidence.'" *Id.* (quoting *Daubert*, 509 U.S. at 596). In other words, the jury is tasked with assessing the expert's credibility; the court's role "'is limited to determining whether expert testimony is pertinent to an issue in the case and whether the methodology underlying the testimony is sound.'" *Id.* (quoting *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000)).

Finally, "[w]hen an expert offers an opinion relevant to applying a legal standard such as [the reasonableness of their medical decisions], the expert's role is 'limited to describing sound professional standards and identifying departures from them.'" *Jimenez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013) (quoting *West v. Waymire,* 114 F.3d 646, 652 (7th Cir. 1997)).

### III.  Discussion

Defendants challenge various aspects of each of Plaintiff's experts' opinions. They argue primarily that (1) the experts' opinions are not tied to any objective standard or methodology but rather their say-so or *ipse dixit*, and (2) that their opinions are premised on an incorrect understanding of the law that Defendants' actions should be viewed with the benefit of hindsight.

The Court proceeds to address Defendants' challenges to each of Plaintiff's experts.

**A.  Nurse Linda Bernard, RN**

Nurse Bernard is a registered nurse with nearly three decades' experience working in correctional health care. Dkt. 154-1 at 1 (Bernard CV). She is certified as a Correctional Health Care Professional by the National Commission on Correctional Healthcare ("NCCHC"). *Id.* at 1; dkt. 121-1 at 1 (Bernard Report). As to her professional background, she has been a staff nurse, director of nursing, health service administrator, regional manager, junior vice president of operations, and interim vice-president of a regional jail system. Dkt. 121-1 at 1. She has worked on accreditation preparation and compliance of standards for facilities accredited by NCCHC and

4

the American Correctional Association, and has an advanced certification as a Certified Correctional Health Care Registered Nurse through NCCHC. *Id.* She was retained by Plaintiff to offer her opinion on the reasonableness of Nurse Rutan's decisions in addition to the medical responses of the correctional officers. Dkt. 154-1 at 63 (Bernard Dep. at 19)[2].

Defendants seek to exclude Nurse Bernard's opinion for two primary reasons: (1) that she is not qualified to offer opinions on any defendant other than Nurse Rutan or on Ms. Chappell's cause of death; and (2) that her opinions regarding Nurse Rutan's decisions are unfounded.

As to the first challenge, Nurse Bernard agrees that she is not qualified to opine on the cause of Ms. Chappell's death. Accordingly, any opinion regarding the cause of her death—including the comments that by the time Nurse Rutan called for emergency help it was "too late" and that due to the delay, emergency room professionals "could not save her"—must be excluded. *See* dkt. 121-1 at 10 (Bernard Report).

With respect to Nurse Bernard testifying about the conduct of correctional officers' decisions, Nurse Bernard's opinions are limited in scope. She states that jail officers (1) failed to follow protocol and training by failing to call a doctor for treatment orders and (2) that they failed to adhere to their training by failing to complete medical protocol sheets during two interactions with Ms. Chappell on July 15th and 16th. *Id.* at 8, 10. These opinions are based on her review of the record, her professional experience with training both healthcare professionals *and* correctional officers on the standards of care for the delivery of medical services to inmates, and the jail's own policies, along with standards set forth by the NCCHC. The Court finds she is qualified to testify about the officers' actions based on her professional experience and familiarity with the governing standards.

---

[2] The Court cites first to the page number of the PDF and then to the page of the deposition in parentheses.

As to the second challenge, Defendants argue that Nurse Bernard's testimony regarding Nurse Rutan should be excluded because it is based on either an incorrect understanding of law or fact. Defendants posit that Nurse Bernard's opinions regarding Nurse Rutan's actions are untrustworthy insofar as they are based on hindsight, imputing onto Nurse Rutan's the officers' knowledge rather than his knowledge. Dkt. 121 at 8 (citing *Kingsley v. Hendrickson*. 576 U.S. 397 ("A [factfinder] must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with 20/20 vision of hindsight.")). But Nurse Bernard's opinions regarding Nurse Rutan's conduct is based on standards of care for nurses, and her factual conclusions are premised on her review of the record. As the Court noted in its summary judgment order, there remain factual disputes about what Nurse Rutan knew and when he knew it. Dkt. 133 at 35. Thus, the soundness of Nurse Bernard's factual underpinnings that supported her opinions is a matter for the jury to decide, not the Court. *See Manpower, Inc. v. Ins. Co. of Penn.,* 732 F.3d 796, 806 (7th Cir. 2013) ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact[.]").

Defendants challenge Nurse Bernard's opinions about several specific actions Nurse Rutan took (or did not take) at the relevant time periods, namely when he saw Ms. Chappell's vomit in a bucket, when he was advised of her condition the night before her death, when he refused to examine her because she was undressed, and when he failed to document their encounters. Dkt. 121 at 9-11. Defendants argue that Nurse Bernard's opinions are not based on sound scientific methodologies but rather are conclusory and speculative. Again, Nurse Bernard's report is based on her record review, her familiarity with healthcare standards (both nursing standards and standards in a carceral setting), and her experience. The Court finds that her methodology is sound,

and disagreement with her conclusions is a matter for cross-examination and the presentation of contrary evidence. *Schultz,* 721 F.3d at 431.

In summary, Nurse Bernard is qualified to testify regarding Nurse Rutan and correctional officers' conduct, Nurse Bernard's reasoning is scientifically sound, and her testimony will assist the jury in understanding the evidence and determining the facts at issue this case. However, she is not qualified to testify about the cause of Ms. McClain's death, or whether Nurse Rutan's or the officers' decisions contributed to her death. Defendants can test Nurse Bernard's opinions through cross examination at trial. Defendants' motion to exclude testimony regarding Nurse Rutan and the officers' conduct is accordingly **granted in part and denied in part**.

### B. Dr. Louis Profeta

Dr. Profeta is a medical doctor who was hired to review the case record and render opinions about the cause of Ms. Chappell's death, whether it was preventable, and whether she incurred prolonged suffering which was avoidable. Dkt. 121-4 (Profeta Report). Defendants challenge only one aspect of Dr. Profeta's testimony—that he is unqualified "to opine on how a reasonable corrections officer should respond when presented with an inmate medical issue." Dkt. 121 at 12. Plaintiff concedes that he is unqualified to do so and further agree that they will not elicit testimony to that effect. Dkt. 154 at 8-9. Accordingly, Defendants' motion to exclude any testimony in which Dr. Profeta opines about correctional officers' conduct is **granted**.

### C. Jeff Eiser

Jess Eiser has nearly 30 years of work experience in the operation and administration of corrections system, with the last 19 in a position as a top administrator. Dkt. 121-5 at 2-3 (Eiser Report). He has written extensively on the subject of jail administration; has been an adjunct instruct on criminal justice; and has been a consultant and trainer for jails of all sizes and at the

7

American Jail Association and National Institute of Corrections. *Id.* He has testified as a jail operations expert in civil rights and tort litigation in almost every state of the country since 1994. *Id.* at 4. Mr. Eiser was hired to provide his opinion on whether the correctional officers met the standard of care with respect to their response to Ms. Chappell's medical condition and whether jail administrators had a practice or policy of failing to remedy known issues with the delivery of healthcare to detainees.

Defendants seek to exclude Mr. Eiser's opinions on the basis that he fails to cite to any sources for his opinions and relies instead on his say-so. Dkt. 121 at 13.

As with the other experts, Defendants argue that some of Mr. Eiser's opinions presume that each officer's subjective knowledge regarding Ms. Chappell's condition should be imputed to all jail staff, rather than considering what each one knew when he or she knew it. Again, Defendants attack the factual underpinnings of Mr. Eiser's opinions—a matter that must be resolved by the factfinder. Further, Defendants' concerns that Mr. Eiser applied a wrong legal standard can be assuaged through careful jury instructions.

Further, the Court disagrees that Mr. Eiser's report is based on his say-so. Mr. Eiser's report lists the materials he reviewed—11,000 pages of records, audio files, and video files. Dkt. 121-5 at 4-10. He also described his methodology, which included reviewing the record materials, reviewing the governing regulatory and industry standards, and assessing the issues through the lens of his experience, training, and education. *Id.* at 10. Mr. Eiser references applicable standards (NCCHC, American Correctional Association, Indiana Administrative Code, Standards for Adult Local Detention Facilities) in addition to the jail's policies when forming his opinion, and he cites to those opinions in his report. *Id.* at 2, 11, 12, 15, 16, 18, 32-35. Thus, the Court concludes that Mr. Eiser's report was based on reliable methodology based on his experience and reliance on

applicable standards. *See Pittman v. County of Madison*, Case No. 08-cv-890-SMY-DGW, 2015 WL 12743585 at *2 (S.D. Ill. Feb. 10, 2015) (concluding that Mr. Eiser's expert opinions about a jail suicide were "appropriate under Rule 702").

Defendants also challenge whether Mr. Eiser has proffered any admissible opinions regarding Plaintiff's *Monell* claim. The Court denied in part Defendants' motion for summary judgment as to Plaintiff's *Monell* claims, finding that a reasonable jury could conclude that "the lack of enforcement of the jail's written medical policies caused Ms. Chappell's suffering and ultimately her death." Dkt. 133 at 44. The Court further noted that although *Monell* claims usually require evidence of a widespread practice, a single incident could trigger *Monell* liability "where a constitutional violation was highly foreseeable." *Id.* at 42-43 (quoting *Miranda v. County of Lake*, 900 F.3d 335, 352 (7th Cir. 2018) and citing *Glisson v. Indiana Dep't of Corrections*, 849 F.3d 372, 382 (7th Cir. 2017)). Defendants challenge Mr. Eiser's opinions on the *Monell* claim insofar as Mr. Eiser relied on this sole incident and thus misconstrues the legal standard for *Monell* liability. But because the aforementioned Seventh Circuit precedent demonstrates that a single incident can invoke *Monell* liability, this is not a valid basis for excluding his testimony. Consistent with the Court's ruling on summary judgment, however, Mr. Eiser cannot testify about the failure by the Sheriff to adequately train jail staff or the failure to maintain adequate staffing levels. *Id.* at 43 (finding the Estate abandoned the failure-to-train claims and that no reasonable jury could find the Sheriff deliberately indifferent to low staffing levels due to his ongoing efforts to recruit nursing staff). Thus, Defendants' challenge to the admissibility of Mr. Eiser's *Monell*-related testimony is **granted in part and denied in part**.

Finally, Plaintiff acknowledge that Mr. Eiser is not qualified to testify about the cause of Ms. Chappell's death and that this matter will not be discussed in his testimony.

9

In summary, Mr. Eiser is qualified to render opinions about the standards of care for the correctional officers and jail administrators at the jail, Mr. Eiser's methodology in reaching his conclusions is sound, and his testimony will assist the jury in understanding the evidence and determining the facts at issue this case. Defendants can test his opinions through cross examination at trial. However, he is not qualified to testify about the cause of Ms. McClain's death. Nor can Mr. Eiser testify regarding *Monell* liability on a failure-to-train or failure-to-staff theory, because the Court found the Sheriff was entitled to summary judgment on those theories. Defendants' motion to exclude Mr. Eiser's testimony is accordingly **granted in part and denied in part**.

### D.  Joseph Rosenberg

Joseph I. Rosenberg, CFA, MBA, MA is a labor economist, with master's degrees in economics, public administration, and business administration, who has experience working as a financial consultant, investment advisor, financial analyst, and mediator. Dkt. 121-7 at 29-38 (Rosenberg CV). Since 2011, he has worked as a "Forensic Economist," offering expert opinions in various personal injury, wrongful death, wrongful termination, and commercial damage litigation. *Id.* at 31. Plaintiff has retained him to analyze Ms. Chappell's projected lost earning potential and loss of household support/services. Plaintiff further requested that Mr. Rosenberg calculate "hypothetical losses of future earnings" if Ms. Chappell elected to pursue a career as a fast-food manager, marketing or sales manager, or in the field of cosmetology. *Id.* at 3; dkt. 121-8 at 3-4, 12 (Rosenberg Dep. at 12-13, 26).

Mr. Rosenberg estimated that, had she not died, Ms. Chappell had a present value of lost future earnings/earning capacity ranging between $158, 079, if Ms. Chappell worked until her minor child turns 18, and $320,860 with loss of household services to $1,524,333, if Ms. Chappell worked until age 65, and $1,687,115 with loss of household services. Dkt. 121-7 at 4-5. To reach

10

this opinion, Mr. Rosenberg applied the "Age-Earnings Cycle" for each of the three aforementioned careers (food service management, retail sales management, and cosmetology) to determine probable earnings growth trajectories. *Id.* at 3. Employee benefits were also calculated. *Id*. at 4. Personal consumption percentages were applied as reductions to earnings capacity, using the authoritative Patton-Nelson Personal Consumption tables. *Id*. Benefit losses were calculated based on BLS average for private sector workers. *Id*. Economic losses were discounted to present value. *Id.*

Defendants do not challenge Mr. Rosenberg's qualifications as an expert. Rather, they challenge the methodology he used at arriving at his opinions regarding Ms. Chappell's loss of earning potential and household support. In arriving at his opinions, Mr. Rosenberg relied solely upon information conveyed to him by Plaintiff's counsel—the extent of which included that Ms. Chappell had previously worked in the fast-food industry. Mr. Rosenberg requested to review Ms. Chappell's employment records but was told the records were unavailable. Dkt. 121-8 at 6 (Rosenberg Dep. at 9). Mr. Rosenberg was aware that Ms. Chappell had a criminal record, but he did not mention it in his report, stating that it was "correct" that the exclusion of that information from his report indicated that he did not "find that information important for purposes of [his] evaluation." Dkt. 121-8 at 7 (Rosenberg Dep. at 15-16). Defendants also note that Mr. Rosenberg did not review the depositions of family members or interview family members or the father of her daughter to assess her role as a caretaker and provider to her daughter. *Id.* at 5, 8-10 (Rosenberg Dep. at 14, 21-23). Further, Mr. Rosenberg acknowledged that the calculations he used were premised on a high school graduate, though Ms. Chappell had only finished the ninth grade. *Id.* at 23 (45). Because Mr. Rosenberg lacked relevant data when creating his projections, Defendants argue his conclusions are speculative and therefore would not assist the trier of fact.

11

The Court acknowledges that Mr. Rosenberg's future earnings were based on a limited set of data, and that his conclusions are based on hypotheticals. Part of that is the natural result of a woman dying at the age of 23. But "[d]eterminations on admissibility should not supplant the adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination." *Gayton*, 593 F.3d at 616. "The district court usurps the role of the jury, and therefore abuses it discretion, if it unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the methodology the expert employed." *Manpower, Inc.*, 732 F.3d at 806. The Court finds that Dr. Rosenberg arrived at his conclusions through "the knowledge and experience of the relevant discipline" of forensic economics. *Id.* (cleaned up). Dr. Rosenberg acknowledged in his report that "[i]t is difficult to provide an economic loss assessment without a work history." Dkt. 121-7 at 3. He also acknowledged that he had to rely on a data set as if Ms. Chappell had graduated from high school because he could not perform those calculations based on a ninth-grade education alone. *See id.* ("'Trained experts commonly extrapolate from existing data.'") (quoting *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Further, Dr. Rosenberg was allowed to rely on employment history information furnished by counsel in forming his lost earning assessment. *See Tuf Racing Prod., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000) (expert's calculations—based on assumptions provided by counsel—permissible under *Daubert*). Dr. Rosenberg's testimony is relevant insofar as it will help the trier of fact to calculate the amount of damages, and the shortcomings of his report should be brought to light through cross examination rather than wholesale exclusion.

In summary, Dr. Rosenberg is qualified to testify about Ms. Chappell's lost earning potential and loss of household support and services, Dr. Rosenberg's reasoning is scientifically sound, and his testimony will assist the jury in understanding the evidence and determining the

facts at issue this case. The shortcomings in Dr. Rosenberg's report may be challenged through vigorous cross-examination, the presentation of contrary evidence, and jury instructions. Defendants' motion to exclude his testimony is **denied**.

## IV. Conclusion

For the foregoing reasons, Defendants' motion to exclude and limit the testimony of Plaintiff's expert witnesses, dkt. [153], is **granted in part and denied in part**.

**IT IS SO ORDERED.**

Date: 4/11/2025

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

All Electronically Registered Counsel

13